# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **WILLIAM V. AND JENNY V., AS PARENTS / GUARDIANS / NEXT FRIENDS OF W.V., A MINOR INDIVIDUAL WITH A DISABILITY,** | § § § § § § | |
| *Plaintiffs,* | § § | |
| | § | **CASE NO. 6:17-CV-00201-ADA-JCM** |
| **v.** | § § | |
| **COPPERAS COVE INDEPENDENT SCHOOL DISTRICT,** | § § § § | |
| *Defendant.* | § | |

## <u>MEMORANDUM AND ORDER</u>

Before the Court are the Motion for Judgment on the Administrative Record or Alternative Motion for Summary Judgment filed by Copperas Cove Independent School District (the "District"), Def.'s Mot. Summ. J. [ECF No. 69], Motion for Judgment on the Administrative Record or Alternatively Motion for Summary Judgment filed by William V. and Jenny V., Pls.' Mot. Summ. J. [ECF No. 70], Response to Summary Judgment filed by Plaintiffs, Pls.' Summ. J. Resp. [ECF No. 71], Response to Summary Judgment filed by Defendant, Def.'s Summ. J. Resp. [ECF No. 72], Objections to Summary Judgment Motion filed by Defendant, Def.'s Objs. [ECF No. 73], Response to Objections filed by Plaintiffs, Pls.' Objs. Resp. [ECF No. 74], Reply in Support of Objections filed by Defendant, Def.'s Objs. Reply [ECF No. 76], Reply in Support of Summary Judgment filed by Plaintiffs, Pls.' Summ. J. Reply [ECF No. 78], Reply in Support of Summary Judgment filed by Defendants, Def.'s Summ. J. Reply [ECF No. 79], Motion to Strike

Amended Complaint filed by Defendant, Def.'s Mot. Strike [ECF No. 84], Response to Motion to Strike filed by Plaintiffs, Pls.' Strike Resp. [ECF No. 86], Reply in Support of Motion to Strike filed by Defendant, Def.'s Strike Reply [ECF No. 90], Motion for Leave to File Supplemental Motion for Summary Judgment filed by Defendant, Def.'s Mot. Supp. [ECF No. 87], Response to Motion to Supplement filed by Plaintiffs, Pls.' Supp. Resp. [ECF No. 89], and Reply in Support of Motion to Supplement filed by Defendant, Def.'s Supp. Reply [ECF No. 90]. For the reasons that follow, the Court **ORDERS** Defendant's Motion for Judgment be **GRANTED**, Plaintiffs' Motion be **DENIED**, and Defendant's Objections, Motion to Supplement, and Motion to Strike be **DENIED** as moot.

## I.      BACKGROUND

Minor W.V. is a fourth-grader with dyslexia and documented-difficulty in reading and articulation. Pls.' First Am. Compl. at 6 [ECF No. 2]. Before entering the District as a first grader, W.V.'s prior school developed a Speech Impairment ("SI") program for W.V. due to articulation errors inconsistent with W.V.'s age and development. Administrative Record ("A.R.") at 8 [ECF No. 9-3].[1] The District accepted the prior school's program when W.V. entered in September 2015 and began providing him Speech Therapy. *Id.*

On April 18, 2016, Plaintiff Jenny V. requested the District evaluate W.V. for a Specific Learning Disability ("SLD"). *Id.* at 12. A District representative responded W.V. would continue to receive the benefits set by the District and its Admission, Review, and Dismissal Committee's ("ARDC") program. *Id.* The District formally responded on April 28, 2016 with a Notice of Action that W.V. would not be tested for an SLD but would be tested for dyslexia. A.R. at 12.

---

[1] The administrative record will herein be cited as "A.R. at __", with "__" denoting the page number.

Plaintiff Jenny V. met with the District's Special Education Director on April 29, 2016 to request SLD testing in addition to dyslexia testing. A.R. at 13. The Director concluded the data only supported dyslexia screening. *Id.* at 13–14. On May 31, 2016, the ARDC stated W.V. would receive dyslexia services daily for the next year, would be given extra time to complete assignments, receive additional instruction as needed, receive on-task reminders, and have materials read to him, among other assistance. *Id.* at 15–16.

On September 6, 2016, a TPRI[2] test administered to W.V. resulted in a "still developing" score in all areas. A.R. at 17–18. W.V. also began receiving assistance under the Wilson Reading System to improve reading accuracy and spelling. *Id.* at 19. On September 12, 2016 the ARDC reconvened to conduct a review of W.V.'s performance. *Id.* The ARDC determined W.V. should undergo a Full Individual Evaluation ("FIE") to reassess his needs and potential for Special Education services, though it did find based on an October 2015 screening that available assistive technology was sufficient to accommodate W.V.'s needs. A.R. at 18–19. The FIE was completed November 16, 2016, with the following relevant results:

- W.V. no longer met eligibility for a SI;

- The GFTA-2 Test, as used by a Speech Language Pathologist ("SLP") employed by the District, scored W.V. in the average standard range with at least 80% accuracy in verbal exchanges;

- The District's SLP recommended W.V. no longer receive Speech Therapy services;

- W.V. no longer met eligibility for a SLD;

---

[2] In education and, particularly, special education, acronyms are ubiquitous to the point that they create, rather than alleviate, most confusion. *See* Special Education Acronyms and Terms, ParentCompanion.Org (accessible at: http://www.parentcompanion.org/article/special-education-acronyms-and-terms) (last accessed September 18, 2018 at 10:41 a.m.). The Court will strive to define those acronyms relevant in its analysis, but will refrain from defining those that are not.

- A Cross-Battery Assessment System ("X-BASS" or "Cross-Battery") applied by a District-employed Educational Diagnostician showed none of W.V.'s global cognitive abilities (i.e. verbal comprehension, working memory) was below average range (the identifier of a student with a SLD);

- The Cross Battery applied by the District, using tests WJ-IV ACH, WJ-IV OL, and KTEA-3, found average or above-average scores for W.V. in all but reading; and,

- W.V.'s reading scores were consistent with his dyslexia and showed improvement concurrent with the District's provided dyslexia services.

A.R. at 21–24.

In January 2017, Plaintiffs requested a due process hearing through the Texas Education Agency. *Id.* at 4. Plaintiffs complained the District: (1) denied W.V. a free appropriate public education ("FAPE") by violating its child find duty; (2) failed to comply with procedural requirements; (3) conducted an inappropriate FIE; and (4) developed an Individualized Education Program ("IEP") that did not meet W.V.'s unique needs. *Id.* at 3. A hearing was held on May 30-31, 2017 before a Special Education Hearing Officer ("SEHO"). *Id.* at 4. The SEHO rendered a decision on June 30, 2017 finding in favor of the District on all counts. *Id.* at 49.

On July 28, 2017, Plaintiff Jenny V., joined by William V., sued the District on behalf of W.V., appealing the decision of the SEHO. Pls.' Compl. at 1. Plaintiffs challenge the following findings by the SEHO: (1) Plaintiffs did not prove the District violated the Individuals with Disabilities Act ("IDEA"); (2) the District's FIE was appropriate; (3) the District properly identified, evaluated, and placed W.V.; (4) the District did not commit any procedural violations; and (5) Plaintiffs were not entitled to an individualized evaluation at District expense. A.R. at 3–4. The parties filed cross-motions for summary judgment on May 31, 2018, each seeking a ruling on the administrative record. Def.'s Mot. Summ. J. at 1; Pls.' Mot. Summ. J. at 1. Defendant also filed, on June 14, 2018, an objection to portions of Plaintiffs' Motion regarding a Department of

Education report, allegations of impropriety by a district employee, transportation costs as damages, conflicts between W.V. and other students, and private school costs. Def.'s Objs. ¶¶ 1–5. Over the following months, the parties fully briefed these disputes.

A Report and Recommendation was filed by the Magistrate Judge on October 15, 2018, recommending that the Court grant in full Defendant Copperas Cove Independent School District's Motion for Judgment on the Administrative Record or, in the Alternative, Motion for Summary Judgment and deny Plaintiffs' opposing Motion for Judgment on the Administrative Record or, in the Alternative, Motion for Summary Judgment. On December 10, 2018, this Court entered an **ORDER** accepting and adopting the Report and Recommendation in its entirety except as to the Magistrate Judge's findings that the District did not procedurally violate the IDEA because W.V. did not qualify as a student with an SLD. On appeal to the United States Court of Appeals for the Fifth Circuit, the Fifth Circuit **VACATED** and **REMANDED** the case for reconsideration, in light of the appropriate standard.

## II.     LEGAL STANDARD

The Individuals with Disabilities Education Act (IDEA) can be found in Title 20, Chapter 33 of the United States Code. The purpose of the IDEA is:

> to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs and to ensure that the rights of children with disabilities and parents of such children are protected.

20 U.S.C. § 1400(d)(1)(A)-(B). The IDEA compels those states receiving federal funding to educate children with disabilities to the maximum extent appropriate with children who are not disabled, 20 U.S.C.S. § 1412(a)(5), and to do so in the least restrictive environment consistent with their needs. *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 922 (W.D. Tex.

2008). In exchange for such funds, States pledge to ensure a free appropriate public education (FAPE) is available to all children with disabilities residing in the State between the ages of 3 and 21. 20 U.S.C.S. § 1412(a)(1)(A). Because the State of Texas receives federal education funding, all school districts within its borders must comply with the IDEA. *Richard R.*, 567 F. Supp. 2d at 922.

A "child with a disability" means a child who has a disability, and because of the disability needs special education and related services. 20 U.S.C.S. § 1401(3)(A). Thus, to qualify for special education, a student (1) must have one or more of the disabilities recognized by the IDEA and (2) need special education services. *Id*. Once a school accepts that one of its students is eligible under the IDEA, the school must develop an individualized educational program (IEP) for that student. *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 306 (5th Cir. 2017). The IEP is a written statement, prepared at a meeting of qualified representatives of the local educational agency, the child's teacher, parent(s), and where appropriate, the child. 20 U.S.C. § 1414(d). To ensure that each student receives a FAPE, school districts must collaborate with parents to develop and implement an IEP that is "reasonably calculated to enable the child to receive educational benefits." 20 U.S.C. § 1400(d)(l)(A); *R.H v. Plano Indep. School Dist*., 607 F.3d 1003, 1008 (5th Cir. 2010).

In the event an IEP is necessary, courts take a two-step approach in reviewing its adequacy: (1) courts first evaluate whether the school district complied with the procedural requirements of the IDEA; and (2) then evaluate whether the IEP is reasonably calculated to enable the student to receive educational benefits. *Klein Indep. School Dist. v Hovem,* 690 F.3d 390, 396 (5th Cir. 2012) (citing *Bd. Of Educ. v. Rowley,* 458 U.S. 176, 206-07 (1982)). Although the FAPE that the IDEA demands of the states need not be the best possible one, nor one that

will maximize the child's educational potential, it must be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him "to benefit" from the instruction. *Richard R.*, 567 F. Supp. 2d at 922. To determine whether the IEP is "reasonably calculated to enable the child to receive educational benefits," courts must evaluate four factors: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) whether there was positive academic and non-academic benefits demonstrated. *Cypress-Fairbanks Indep. School Dist. v. Michael F.*, 118 F.3d 245, 248, 253 (5th Cir. 1997).

The judiciary's role under the IDEA is purposefully limited. *Richard R.*, 567 F. Supp. 2d at 922. Therefore, while a federal district court's review of a state hearing officer's decision is virtually de novo, this by no means represents an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. *Id.* Instead, the district court should accord due weight to the state hearing officer's findings. *Id.* Operationally, the "due weight" standard calls upon the district court to receive the record of the administrative proceedings, to take additional evidence at the request of any party, and ultimately, to reach an independent decision based on a preponderance of the evidence. *Id.* Accordingly, the Court uses the two-part inquiry, taking care not to substitute its own notion of sound educational policy. *Richard R.*, 567 F. Supp. 2d at 926-27. First, the Court will consider whether the state complied with the procedures as set forth in the IDEA. Secondly, the Court will determine if the District's actions were "reasonably calculated" to enable the child to receive educational benefits. *Id.* Under this two-part test, summary judgment effectively asks the Court

to decide the case based on the administrative record. *E.G. v. Northside Indep. Sch. Dist.*, No. SA:12-CA-949-FB, 2014 WL 12537177, at *5 (W.D. Tex. March 31, 2014) (Biery, J.).

Plaintiffs argue they should be granted summary judgment for six independent reasons. Pls.' Mot. Summ. J. at 1–20. First, they argue the District violated the IDEA by unduly delaying W.V.'s assessment for a SLD. *Id.* at 3. Second, they argue the District violated the IDEA by finding W.V. did not qualify as a student with a SLD. *Id.* at 5. Third, they argue the District violated the IDEA by finding W.V. did not qualify as a student with a Speech and Language Impairment. *Id.* at 9. Fourth, they argue the District violated the IDEA by failing to evaluate whether assistive technology was needed for W.V.'s FAPE. *Id.* at 13. Fifth, they argue the District violated the IDEA by implementing the Wilson Reading Program because the program did not demonstrate positive results. *Id.* at 14. Lastly, Plaintiff's argue the District violated the IDEA by implementing the Wilson Reading Program because the program was not research-based. Pls.' Mot. Summ. J. at 15.

Alternatively, the District argues it is entitled to summary judgment for five reasons. Def.'s Mot. Summ. J. at 7. First, it argues it had no reason to suspect W.V. suffered from a SLD. *Id.* at 7–8. Second, it argues the methods it used to assess SLD eligibility were appropriate. *Id.* at 10–11. Third, it argues any alleged procedural violation of the IDEA did not lead to the denial of W.V.'s FAPE or Plaintiffs' opportunity to participate. *Id.* at 14–15. Fourth, it argues the Court may not consider Plaintiffs' purported evidentiary challenges. *Id.* at 19–20. Finally, it argues Plaintiffs are not entitled to reimbursement for W.V.'s private education in North Carolina. *Id.* at 20–21.

### III.    DISCUSSION

The IDEA can be violated in two ways. *Richard R.*, 567 F. Supp. 2d at 926-27; *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). First, a school district can fail to implement procedural safeguards set forth by the IDEA. *Id.* Second, a school district can fail to make reasonably-calculated efforts to ensure a student received educational benefits. *Id.* A plaintiff must therefore identify a procedural requirement imposed by the IDEA and show how the corresponding district violated it. *See Leticia H. v. Ysleta Indep. Sch. Dist.*, 502 F. Supp. 2d 512, 518 (W.D. Tex. 2006). However, even after such showing, the plaintiff must then prove an injury resulted from the procedural violation. *See, e.g., id.* ("Defendant is correct that a procedural violation standing alone will not entitle a plaintiff to relief. Accordingly, most courts require a showing of substantive harm precipitating from a procedural violation before granting relief.") (citing *Adam J v. Keller Indep. Sch. Dist.*, 328 F.3d 804 (5th Cir. 2003)). A plaintiff may be injured by either (1) a denial of the child's FAPE if that denial resulted in the loss of educational opportunity; or (2) denial of the parent's ability to participate in the IEP process. *Adam J v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003).

**A.    The District Procedurally Violated the IDEA because W.V. is a Child with a Disability Under the Act.**

The IDEA does not compel the School District to provide a student with an IEP unless the student qualifies as a "child with a disability" under the Act. 20 U.S.C. § 1414(d)(2)(A); *see also* 34 C.F.R § 300.306(c)(2). There is a two-part test for making such a determination. A child qualifies as a "child with a disability" under the IDEA if the child (1) has an intellectual disability, specific learning disability (SLD), or other health impairment and (2) "by reason thereof, needs special education and related services." 34 C.F.R. § 300.8(a)(1).

*i.     W.V. has a specific learning disability*

The IDEA defines a SLD as:

(A) In general. The term "specific learning disability" means a disorder in 1 or more of
the basic psychological processes involved in understanding or in using language, spoken
or written, which disorder may manifest itself in the imperfect ability to listen, think,
speak, read, write, spell, or do mathematical calculations.

(B) Disorders included. Such term includes such conditions as perceptual disabilities,
brain injury, minimal brain dysfunction, *dyslexia*, and developmental aphasia

20 U.S.C. § 1401 (emphasis added). The IDEA's statutory language explicitly includes dyslexia

as a disorder included as a SLD. *Id*. W.V. was diagnosed with dyslexia; therefore, the

SEHO erred in concluding that W.V. did not have a SLD.

The District claims that "it is undisputed that, at the time of the due process hearing, the

law did not require a finding of an SLD when dyslexia was diagnosed." However, the District

cites no authority for this claim and does not address the fact that the IDEA itself explicitly

defines dyslexia as an SLD. The provisions from *The Dyslexia Handbook* that the District cites

for support gives background on how dyslexia is diagnosed; however, it does not provide any

support for the District's argument that dyslexia is not an SLD.

The District correctly notes that the IDEA does not require school districts to classify

students by a disability or create an appropriate label to identify a student with a disability. 20

U.S.C. § 1412(a)(3)(B); *G.I. v. Lewisville Indep. Sch. Dist*., No. 4:12-cv-385, 2013 WL 4523581,

at *10 (E.D. Tex. Aug. 23, 2013). Defendant then quotes the Fifth Circuit, which stated that:

[T]he Child Find provision itself suggests that diagnostic labels alone should not be
determinative when considering whether a remedy furthers IDEA's purposes. The
position that the diagnostic label affixed to a child should determine whether she has
prevailed under the IDEA "reflects a preoccupation with labels that [IDEA] do[es] not
share."

*Lauren C. by and through Tracey K v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 376 (5th Cir. 2018) (emphasis in original) (quoting *Angela L. v. Pasadena Indep. Sch. Dist.*, 918 F.2d 1188, 1195 (5th Cir. 1990)). In these cases, the Fifth Circuit determined that a child displaying the symptoms of an SLD as listed in the statute, who has not been labeled with such a condition, should not be denied services for *lack* of a label. The context of these cases indicates that the Fifth Circuit's statements do not support the idea that a school district can wiggle out of providing services once a condition like dyslexia has been diagnosed, as the District suggests. In the present case, W.V. has already been diagnosed with an eligible condition. Such a diagnosis negates the need for additional testing to determine SLD status and the District's discretion in making such a determination.

Therefore, the Court finds that the District and SEHO erred in finding that W.V. did not have a SLD. However, this inquiry only satisfies the first prong of the two-part test in determining whether W.V. is a "child with a disability" and therefore entitled to an IEP.

   ii.      *W.V. "needed" special education services because of his SLD*

What it means to *need* special education and related services is not clear. *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 215 (5th Cir. 2019). The IDEA defines "special education" as "specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). Regulations elaborate that "[s]pecially designed instruction means adapting . . . the content, methodology, or delivery of instruction [to] address the unique needs of the child that result from the child's disability [and to] ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. § 300.39(b)(3). The IDEA defines "related services" to mean "transportation, and such developmental, corrective, and other

supportive services . . . as may be required to assist a child with a disability to benefit from special education." *Id.* § 1401(26)(A). Importantly, if a child "needs a related service and not special education, the child is not [eligible]." 34 C.F.R. § 300.8(a)(2)(i).

As the Fifth Circuit highlighted, the line between "special education" and "related services" is murky; however, case law suggests that where a child is being educated in the regular classrooms of a public school with only minor accommodations and is making educational progress, the child does not "need" special education within the meaning of the IDEA. *William V. v. Copperas Cove Indep. Sch. Dist.*, 774 F. App'x 253, 253 (5th Cir. 2019).[3]

In the present case, W.V.'s accommodations cannot be said to be minor nor merely a "related service." Even though W.V. was making educational progress, he was still in need of specifically designed instruction to address his unique needs.

On June 6, 2016, W.V. finished first grade but failed to meet State standards in reading and writing. A.R. at 16. The complaint was filed in January 2017 during the middle of W.V.'s second-grade year, and at the time of the February 2017 ARDC meeting, W.V. was still receiving specially designed instruction to address his unique needs. A.R. at 26. Specifically, when W.V. started second grade in August 2016, his teachers were provided with hard copies of

---

[3] Citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 n.28 (1982) ("When the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit."); *Lisa M.*, 924 F.3d at 215-18 (finding a child's struggles in the general education environment indicative of a need for special education); *Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 384 (5th Cir. 2007) ("First, A.D.'s passing grades and success on the TAKS test demonstrate academic progress."); *C.M. ex rel. Jodi M. v. Dep't of Educ., State of Hawaii*, 476 F. App'x 674, 677 (9th Cir. 2012) ("[T]he district court applied the proper standard in determining that, based on C.M.'s performance in her regular education classes, with accommodations and modifications, C.M. was able to benefit from her general education classes without special education services."); *A.L. v. Alamo Heights Indep. Sch. Dist.*, 2018 WL 4955220, at *6 (W.D. Tex. Oct. 12, 2018) ("[S]uccess in general education classes cuts against placement in special education.").

his accommodations and modifications including: daily dyslexia services in the general education setting; extra time to complete assignments; having an opportunity to repeat and explain instructions; sit near the teacher; receive reminders to stay on task; and have all material, except reading class passages, read to him. A.R. at 15–16. The following month W.V.'s reading teacher admitted that to be successful in the educational setting, W.V needed oral administration of assignments, tests, and phonics instruction. A.R. at 17. Furthermore, W.V. began participating in a Wilson Reading System group for students with dyslexia for 45 minutes during the Response to Intervention ("RtI") period. A.R. at 19. W.V. also attended 45-minute long, one-on-one tutoring sessions with the interventionist after school on Thursdays, specifically using the Wilson Reading Program. *Id*. Given the definition of "special education" as set forth in the IDEA and the manner in which the District adapted the content, methodology, and delivery of instruction to specifically address the unique needs of W.V., it cannot be said that these accommodations and modifications were minor, nor merely a "related service."

Moreover, it cannot be said that the special education services were no longer needed as determined by the District in November 2016 and later confirmed by the ARDC in February 2017. *See* A.R. at 27. In November, when the District completed W.V.'s FIE, it was determined that W.V. had weaknesses in reading achievement that was attributable to his previously identified dyslexia. A.R. at 23. His basic reading achievement was well below average range, consistent with dyslexia, which affected his reading comprehension and reading fluency. *Id*. In February, when reviewing the District's FIE, the ARDC determined that W.V. would continue to receive dyslexia intervention. A.R. at 26. The Districts Educational Diagnostician summarized the evaluation, noting that W.V.'s below average scores in reading skills matched the deficit described in his dyslexia evaluation.

Accordingly, W.V. was still in need of specifically designed instruction to address unique needs associated with his dyslexia. Therefore, by reason of his SLD, W.V. needs special education and related services. Thus, W.V. is a "child with a disability" as defined by the IDEA.

## B. Plaintiffs Were Not Injured by the District's Procedural Violation of the IDEA

After proving a procedural violation, a plaintiff must prove that an injury resulted from such violation. *Leticia H.*, 502 F. Supp.2d at 518. A Plaintiff can demonstrate they were injured from a procedural violation if that procedural error: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the IEP process; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *see also Adam J.*, 328 F.3d at 811–12. Plaintiffs allege that W.V. was denied a FAPE and, consequentially, that W.V. was denied educational benefits. However, Plaintiffs do not allege that the District denied their ability to participate in the IEP process. The Court finds that Plaintiffs demonstrated a procedural violation but failed to demonstrate that W.V. was injured as a result of that violation.

The U.S. Supreme Court first addressed the question of when an IEP provides a FAPE in *Board of Education of Hendrick Hudson Central School District v. Rowley, Westchester County*, 458 U.S. 176 (1982). The Fifth Circuit summarized the *Rowley* standard:

> [An IEP] need not be the best possible one, nor one that will maximize the child's Educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction. In other words, the IDEA guarantees only a 'basic floor of opportunity' for every disabled child, consisting of 'specialized instruction and related services which are individually designed to provide educational benefit.' Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be 'likely to produce progress, not regression or trivial educational advancement.' In short, the educational benefit that an IEP is designed to achieve must be 'meaningful.' (internal citations omitted). *Bobby R.*, 200 F.3d at 347, citing to *Cypress-Fairbanks*, 118 F.3d at 247–48.

In 2017, in *Endrew F. v. Douglas Cnty. Sch. Dist.*, the Supreme Court revisited the question of what constitutes a FAPE and concluded a FAPE "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. 988, 1001 (2017); *see also Rowley*, 458 U.S. 176, 181 (1982); *accord C.M. v. Warren Indep. Sch. Dist.* 117 LRP 17212 (E.D. Tex. 2017) (unpublished).

Since at least 1997, the Fifth Circuit has tied the provisions of a FAPE to an inquiry into a child's unique circumstances, a standard that is in alignment with the Supreme Court precedent. *C.G. v. Waller Indep. Sch. Dist.*, No. 16-20439 (5th Cir. 2017). The Fifth Circuit identifies four factors to analyze and determine whether a school district substantively denied a student a FAPE: (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 253 (5th Cir. 1997).[4] The Fifth Circuit never specified how the *Michael F.* factors must be weighed by a district court. *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009). Instead, the factors are general indicators of the IEP's appropriateness intended to guide a district court in the fact-intensive inquiry of whether an IEP provided an educational benefit. *Id.* at 294.

---

[4]Plaintiffs do not address these factors directly in their motion and instead claim the District must offer an IEP reasonably calculated to enable W.V. to make appropriate progress in light of his circumstances. Pls.' Mot. Summ. J. at 13 (citing *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017)). The recent holding in *Endrew F.*, however, does not create a new standard for determining whether a school district substantively denied a student a FAPE. *Renee J. v. Houston Indep. Sch. Dist.*, No. 4:16-CV-02828, 2017 WL 6761876, at *3 (S.D. Tex. Nov. 1, 2017). Instead, *Endrew F.* is consistent with the Fifth Circuit's four-factor analysis in *Michael F.* and therefore did not invalidate the Fifth Circuit's factors to assess whether a student received a FAPE. *Id.*

<blockquote>

    i.        *The IEP at bar was individualized to fit W.V.'s assessments and performance.*

</blockquote>

Multiple assessments, performance information, and evaluations conducted on a disabled child are sufficient to demonstrate the IEP is individualized.[5] The Court, upon reviewing Plaintiffs' pleadings, cannot find any claim the District's IEP was not individualized to W.V.  Pls.' Mot. Summ. J. at 13–17.  The SEHO lists multiple ARDC meetings, with participation from W.V.'s parents, where W.V.'s IEP was discussed, set, and reevaluated.  A.R. at 17–18.  Accordingly, without argument to the contrary, the first factor weighs in favor of the District.

<blockquote>

    ii.       *The IEP at bar was administered in the least restrictive environment.*

</blockquote>

The 'least restrictive environment' requires a child with a disability to be placed among children who are not disabled, when possible.  *Z.C.*, 2015 WL 11123347 at *6.  The Fifth Circuit uses a flexible, two-part test to determine whether a disabled child is in the least restrictive environment: (1) whether education in a regular classroom can be satisfactorily achieved for a given child, and (2) whether the school 'mainstreamed' the child to the extent appropriate.  *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989).  In the case at bar, the District placed W.V. in the Wilson Reading System group, a program to promote reading skills for students with difficulty for 45 minutes during RtI period and tutoring sessions after school. A.R. at 19.  All remaining instruction was administered to W.V. in the general education setting. A.R. at 44.

---

[5] *E.g., Z.C. v. Killeen Indep. Sch. Dist.*, No. W:14-CV-086-WSS, 2015 WL 11123347, at *6 (W.D. Tex. Feb. 17, 2015) (Smith, J.), aff'd sub nom.; *Phoung C. v. Killeen Indep. Sch. Dist.*, 619 F. App'x 398 (5th Cir. 2015); *C.G. v. Waller Indep. Sch. Dist.*, No. 4:15-CV-00123, 2016 WL 3144161, at *7 (S.D. Tex. June 6, 2016), aff'd sub nom.; *C.G. v. Waller Indep. Sch. Dist.*, 697 F. App'x 816 (5th Cir. 2017) (as revised June 29, 2017); *C.M. v. Warren Indep. Sch. Dist.*, No. 9:16-CV-165, 2017 WL 4479613, at *12 (E.D. Tex. Apr. 18, 2017); *Shafi v. Lewisville Indep. Sch. Dist.*, No. 4:15-CV-599, 2016 WL 7242768, at *6 (E.D. Tex. Dec. 15, 2016) (each upholding individualized IEPs when assessments and evaluations focused on the disabled child).

Nothing in this Court's analysis of the record shows the IEP isolated W.V. from other students in a general education setting or that W.V. needed isolation for any reason other than his dyslexia. Accordingly, the second factor weighs in favor of the District.

        iii.    *The IEP at bar was effectuated in a coordinated and collaborative manner by key stakeholders.*

An IEP is coordinated and collaborative when it results from discussions and input by the child's parents, teachers, administrators, or other stakeholders.[6] Here, W.V.'s mother met with administrators to discuss W.V.'s evaluation on numerous occasions. A.R. at 12. W.V.'s parents were invited to ARDC meetings and W.V.'s mother participated in multiple meetings to discuss W.V.'s IEP. A.R. at 17-18. Although they later disagreed, W.V.'s parents consented to the ARDC's initial determinations. *Id.* Parental disagreement with a determination alone does not reflect a lack of coordination and collaboration. *R.C. v. Keller Indep. Sch. Dist.*, 958 F. Supp. 2d 718, 736 (N.D. Tex. 2013). Because the Court finds the District's effort was clearly collaborative and coordinated with regards to W.V.'s IEP, the third factor weighs in favor of the District.

        iv.    *The IEP at bar demonstrated positive academic and non-academic results.*

Despite Plaintiffs' failure to address *Michael F.*, Plaintiffs present a genuine argument regarding W.V.'s positive academic and nonacademic benefits (factor four). Pls.' Mot. Summ. J. at 13–15. The Fifth Circuit does not require a district court to consider the four factors or weigh them in a particular way. *Michael Z.*, 580 F.3d at 293. Therefore, district courts may afford

---

[6] *See, e.g., Michael F.*, 118 F.3d at 253 (finding program development and design based on teacher, administrator, and counselor discussions was a coordinated and collaborative effort); *Z.C.*, 2015 WL 11123347 at *7 (concluding stakeholders, including parents, grandparents, advocates, legal counsel, and therapists, participated to some extent in the child's educational services was enough to meet the third factor); *C.M.*, 2017 WL 4479613 at *13 (holding email exchanges between mother, teachers, and administrators addressing child, although disagreeable and confrontational, met the collaboration element).

dispositive weight to any one factor. *See id.* at 294 (upholding a district court's decision based solely on the fourth factor). Plaintiffs ask the Court to do so here. Pls.' Mot. Summ. J. at 13-14.

In determining whether demonstrable academic and non-academic benefits arose from an IEP, a disabled child's development should be measured with respect to the individual student, not the rest of the class. *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000). Only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers represents a lack of educational benefit. *Id.* In *Bobby R.*, the Court held the disabled child received an educational benefit from his IEP because his test scores and grade levels improved year to year. *Id.* at 350. Other courts consider the fourth factor met when the child makes progress with behavior and social skills alone. *A.B. v. Clear Creek Indep. Sch. Dist.*, No. 4:17-CV-2382, 2018 WL 4680564, at *5 (S.D. Tex. Sept. 28, 2018). In *Michael Z.*, the Fifth Circuit upheld a district court's decision to place dispositive weight on the fourth factor and found the child's IEP showed a "consistent pattern of regress." *Michael Z.*, 580 F.3d at 294. The district court further found the IEP measures used by the district were insufficient to resolve the disabled child's difficulties because the measures repeatedly failed in the past under the continuingly-deficient IEP. *Id.*

Here, Plaintiffs argue W.V. did not show progress because he failed to meet standards on the state TPRI early reading assessment, could not meet grade-level standards based on assessments, and was one-to-two years behind his peers. Pls.' Mot. Summ. J. at 14. Plaintiffs' expert found it difficult to believe W.V. progressed under the Wilson program standards and testified W.V. was not making adequate progress in reading. *Id.* Plaintiff's argument is misplaced. The correct evaluation measures a student's individual development—it does not compare him to his peers. *Bobby R.*, 200 F.3d at 349. As noted by the Fifth Circuit:

a disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student, as declining percentile scores do not necessarily represent a lack of education benefit, but the child's inability to maintain the same level of academic progress achieved by his non-disabled peers[.]

*Id.*

Courts hold more than *de minimus* progress is sufficient to show positive academic and non-academic benefit. *See C.M.*, 2017 WL 4479613, at *13 (holding a disabled child's progress in English and other areas was more than *de minimus* and outweighed low grades). Here, the record shows W.V. made progress under the Wilson program. A.R. at 1189–91. Prior to attending the Wilson program and at the end of his first-grade year, W.V. read at Faountas and Pinnell ("F&P") level D (end of kindergarten). A.R. at 2658:2–16. On September 12, 2016, and in accordance with his IEP, W.V. participated in the Wilson Reading System group for students with dyslexia, as well as one-on-one tutoring sessions. *Id.* at 3214:9-3215:14. Under the IEP, progress reports were sent home every six weeks and demonstrated W.V. was progressing towards his goal of exhibiting 85% conversational speech accuracy. *Id.* at 2961:25-2962:14. By the end of second grade, W.V. read at F&P level J (end of first grade), with corresponding accuracy at 90% and comprehension at seven out of seven. *Id.* at 2767:4-17. Additionally, W.V. received a "B" in reading during the 2016-17 school year. *Id.*

Plaintiffs challenge these measurements on both their validity and appropriateness. Pls.' Mot. Summ. J. at 14. Plaintiffs first contest the validity of the District's measurements, arguing the progress reporting was "vague and incomplete at best" and W.V.'s teacher "modified" W.V.'s grades. *Id.* at 15. Improving W.V.'s letter grades, however, was not the goal of his IEP. A.R. at 2785:2-24. Instead, the ARDC's IEP was targeted at improving W.V.'s articulation up to a set percentage of accuracy. A.R. at 905. This goal was effectuated by the Wilson Reading System

participation and one-on-one tutoring sessions outside the regular curriculum.  *Id.*  W.V.'s second-grade marks were not the means to measure W.V.'s progress.  *Id.*

Furthermore, the SEHO concluded W.V.'s IEP was reasonably calculated to provide him with academic and non-academic benefits.  *Id.* at 45.  The SEHO concluded W.V. "maintain[ed] a level of mastery" with all target sounds as well as structured sentence and conversational levels because of the services provided by the Speech Therapy under W.V.'s IEP.  *Id.* at 45-46.  The Court's task is not to second-guess the decisions of school officials or to impose its own plans for the education of disabled students, but rather to determine only whether those school officials complied with the IDEA.  *A. B.*, 2018 WL 4680564 at *2.  Based on the aforementioned evidence of W.V.'s progress under the IEP and the SEHO's determination, the Court finds that the officials complied with the IDEA.

Second, Plaintiffs claim the IEP measurements must be "based on peer-reviewed research to the extent practicable."  Pls.' Mot. Summ. J. at 15 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(IV)).  Defendant concedes the record is "silent as to whether the Wilson Reading System is based on peer-reviewed research."  Def.'s Mot' Summ. J. at 18.  Nevertheless, peer-reviewed research is not a requirement under the fourth *Michael F.* factor.  *Renee J.*, 2017 WL 6761876, at *5.  In *Renee J.*, the plaintiff argued an autistic student was denied FAPE because the district did not use Applied Behavioral Analysis in fashioning and implementing the IEP.  *Id.*  The committee considered a number of IEP approaches, ranging from following guidelines in the Texas Autism Supplement to rewarding good behavior with a visit to a police station or restaurant.  *Id.*  On review, the district court found the school district did not deny FAPE by failing to use the Applied Behavioral Analysis because the parents did not specifically ask the school district to use Applied Behavioral Analysis

in devising the IEP nor did they point to anything other than the failure of the school district to use that type of analysis. *Id.*

As in *Renee J.*, W.V.'s parents did not specifically ask the District to implement any Applied Behavioral Analysis. A.R. at 19, 3096:2-10. Further, Plaintiffs consented to the FIE determination by the ARDC and W.V.'s participation in the Wilson Reading System group, a structured, researched-based program that comports with the Texas Dyslexia Handbook. *Id.* at 3099:23-3100:12. While "Applied Behavior Analysis is one example of peer-reviewed practices, [it is] not the only option." *Renee J.*, 2017 WL 6761876, at *5.

The record shows W.V. made progress and improvements under his IEP and the SEHO correctly found the progress more than *de minimus* regarding the positive academic and non-academic benefits of the IEP. A.R. at 3237:4-25. As pointed out by the Fifth Circuit, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit for purposes of the Individuals with Disabilities Education Act. *Alvin Indep. Sch. Dist. v. A.D.*, 503 F.3d 378, 379 (5th Cir. 2007). At the beginning of first grade, W.V. read at a beginning kindergarten level. *Id.* By the meeting date, he was reading at an end of kindergarten level. *Id.* Additionally, W.V. was progressing toward expectation in Writing and was at mid-year first grade level in Math. *Id.* He was passing all classes. *Id.* The record clearly demonstrates that W.V. was continuously progressing in the general education setting.

In May 2016, toward the end of W.V.'s first grade year, he was reading at F&P level D (end of kindergarten, beginning of first grade level), up 97% from F&P level A when he began first grade. *Id* at 16. On June 6, 2016, W.V. completed first grade, meeting State standards in all subjects except for reading and writing, in which he was making progress towards first grade standards. *Id.* W.V. began first grade at F&P level A and by May 2, 2016, W.V. could read at F&P

level D with 95% accuracy and 100% comprehension and at F&P level E with 80% accuracy and 100% comprehension.

By second grade, in relation to other students his age, W.V. was in the average range for receptive and expressive language skills, motor coordination, and was in the average or above average range for academic characteristics. *Id.* at 17. He was reading orally at F&P level D, and his reading comprehension skills were above average. *Id.* The accommodations required at this point for W.V to be successful in the general education setting were oral administration of assignments and tests, phonics instruction, along with additional time to complete assignments and assessments. *Id.*

Additionally, the SLP sent IEP progress reports home with W.V.'s report cards every six weeks during the 2016-2017 school year. *Id* at 20. W.V.'s September 2016 IEP Progress Report showed W.V.'s progress was sufficient for him to attain his Speech goal by the next annual ARDC meeting date. *Id.* W.V.'s November 2016 IEP Progress Report showed W.V. had reached a level of mastery with all target sounds. *Id.* In order for a child to have mastered a sound, it is generally necessary to exhibit 85% to 90% mastery over therapy sessions, across activities, and across listeners. *Id.* W.V.'s December 2016 IEP Progress Report recommended no further action to enable goal achievement. *Id.* W.V.'s February 2017 IEP Progress Report stated he had reached a level of mastery with all target sounds; was demonstrating good productions and clarity; was using all sounds appropriately and accurately in running conversational speech; and his accuracy of sound production was being maintained. *Id* at 21. W.V.'s April 2017 IEP Progress Report showed he had mastered his Speech goal and objectives. *Id.*

Finally, W.V.'s May 2017 IEP Progress Report showed he had maintained a level of mastery with all target speech sounds and his production-maintained intelligibility at the structured

sentence and conversational levels. *Id.* All factual findings which clearly demonstrate that W.V. was greatly benefiting from the education services provided by the District. When the ARDC met on February 27, 2017, to review W.V.'s November 16, 2016 FIE, W.V. had passing grades for the first semester, ranging from 82 to 94, and the first six weeks of the second semester, ranging from 80 to 95. *Id.* at 26. Therefore, the Court agrees with the SEHO's decision and finds the fourth factor weighs in favor of the District.

Even though the District determined that W.V. was no longer a child with an SLD and was no longer eligible for Special Education services, the District continued providing W.V. with the same dyslexia and Special Education services. A.R. at 9, 26. Furthermore, the District kept W.V.'s IEP in place months after the decision was made by the ARDC that W.V. did not need one, and W.V.'s IEP was still routinely reevaluated and modified to meet his needs. A.R. at 12. The record is permeated with evidence that W.V.'s education was specifically designed to meet his needs and provided services that permitted him to benefit from the instruction. In fact, W.V. made substantial educational progress as a result of the IEP implemented by the District. The ARDC complied with the IDEA's regulatory requirements, Texas law, and relevant case law in developing an IEP reasonably calculated to provide a meaningful educational benefit to W.V. and was appropriate in light of his circumstances. Therefore, in light of the foregoing analysis, the Court grants the District's Motion for Summary Judgment.

## A. Other Motions

Remaining are Defendant's Objections to Plaintiff's Summary Judgment Motion, Motion to Strike Plaintiff's Amended Complaint, and Motion to Supplement its Motion for Summary Judgment. Def.'s Objs.; Def.'s Mot. Strike; Def.'s Mot. Supp. Because the Court finds the District's motion meritorious, Defendant's Objections and Motion to Supplement are moot.

Likewise, Defendant's Motion to Strike is moot. First, the motions at issue did not include any reference to the Texas Education Agency's Performance-Based Monitoring System and, to the extent they did, the Court concludes it of no consequence in resolving this dispute in favor of the District. Second, because the Court is granting Defendant's Motion for Judgment, the Plaintiff's claims for relief—even if improper—are irrelevant. The Court admonishes the parties to, in the future, limit their disputes following the filing of case-dispositive motions to those necessary to resolving the pending motions. In reviewing the numerous additional pleadings, the Court is of the opinion the parties did not do so here.

## IV.    CONCLUSION

Based on the foregoing reasons, the Court finds the District committed a procedural violation of the IDEA; however, that violation did not result in a legally cognizable injury. Plaintiffs must prove that they were injured by a procedural violation to recover and failed to do so. It is therefore **ORDERED** that Defendant's Motion for Judgment on the Administrative Record or, in the Alternative, Motion for Summary Judgment is **GRANTED**. Because Plaintiffs failed to meet their burden to establish reversible error in the SEHO's findings below, Plaintiff's Motion for Judgment on the Administrative Record or, in the Alternative, Motion for Summary Judgment is **DENIED**. Defendant's remaining motions are **DENIED** as moot.

**SIGNED** this 22nd day of October 2019.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE